[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12613

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 21, 2011
JOHN LEY
CLERK

D.C. Docket No. 3:09-cv-00894-HES-JRK

INTERVEST CONSTRUCTION OF JAX, INC.,
a Florida corporation,
ICI HOMES, INC.,
a Florida corporation,

Plaintiffs - Counter Defendants - Appellants,

versus

GENERAL FIDELITY INSURANCE COMPANY,

Defendant - Counter Claimant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 21, 2011)

Before TJOFLAT and CARNES, Circuit Judges, and MICKLE,* District Judge.

_____

* Honorable Stephan P. Mickle, Senior United States District Judge for the Northern District of Florida, sitting by designation.

PER CURIAM:

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF FLORIDA PURSUANT TO FLORIDA CONSTITUTION ARTICLE V, § 3(b)(6).

TO THE SUPREME COURT OF FLORIDA AND ITS HONORABLE JUSTICES:

This case involves unanswered questions of Florida law that are central to this appeal. Because these questions are determinative of the cause in this case and there are no controlling precedents from the Supreme Court of Florida, we respectfully certify these questions for resolution.

I.

This controversy exists between the insureds, Intervest Construction of Jax, Inc. and ICI Homes, Inc. (collectively "ICI"), and their insurer, General Fidelity Insurance Company, over whether General Fidelity breached its obligations under a commercial general liability insurance policy, number BAG0002112-00 (the "General Fidelity Policy"), that ICI had with General Fidelity at the time of the accident. The coverage dispute arose out of a personal injury lawsuit filed against ICI by an injured homeowner.

In 2000, ICI contracted with Custom Cutting, Inc. for Custom Cutting to provide trim work, including installation of attic stairs in a residence that ICI was in the process of building. The contract between Custom Cutting and ICI contained an indemnification provision requiring Custom Cutting to indemnify ICI for any damages resulting from Custom Cutting's negligence. In April 2007, Katherine Ferrin, the owner of a residence constructed by ICI, fell while using the attic stairs installed by Custom Cutting. This fall resulted in serious injuries. Ferrin then filed suit against ICI for her injuries; she did not file suit against Custom Cutting. In turn, ICI sought indemnification from Custom Cutting under the terms of the subcontract. At the time of the accident, Custom Cutting maintained a commercial general liability insurance policy with North Pointe Insurance Company. ICI was not an additional insured under Custom Cutting's policy with North Pointe. ICI, meanwhile, held the General Fidelity Policy at the time of the accident. Contained in the General Fidelity Policy was a Self-Insured Retention endorsement (the "SIR endorsement") in the amount of $1 million.

ICI, Custom Cutting, North Pointe, General Fidelity, and Ferrin participated in a mediation of Ferrin's suit. At the mediation, the parties agreed to a $1.6 million settlement of Ferrin's claim. As part of the settlement, North Pointe agreed to pay ICI

3

$1 million to settle ICI's indemnification claim against Custom Cutting.  ICI, in turn, would pay that $1 million to Ferrin.  The instant dispute then arose as to whether ICI or General Fidelity was responsible for paying Ferrin the other $600,000.

Because of General Fidelity and ICI's disagreement over coverage, North Pointe paid the $1 million into the trust account of ICI's counsel; each party reserved all rights and claims against the other.  Approximately one month later, both ICI and Custom Cutting paid $300,000 each to Ferrin, in addition to the $1 million from North Point, in order to settle her suit for the full $1.6 million.  ICI filed suit in the Circuit Court of the Fourth Judicial Circuit of Florida for breach of contract and a declaratory judgment regarding ICI's rights under the General Fidelity Policy.  General Fidelity then removed the case to the United States District Court for the Middle District of Florida.

## II.

### A.

The parties disagree about which provisions of the General Fidelity Policy are relevant; however, the crux of the dispute focuses on the SIR endorsement and the transfer of rights clause.  The SIR endorsement states that General Fidelity will

provide coverage only after the insured has exhausted the $1 million SIR.[1]  The

parties dispute the effect of the language in the SIR endorsement as applied to these

facts.  The transfer of rights clause, on the other hand, grants the insurer some

subrogation rights, the extent of which are also disputed.[2]

ICI alleged in its complaint that General Fidelity failed to perform its

obligation under the General Fidelity Policy by refusing to pay $600,000 of the $1.6

million settlement.  In taking this position, ICI essentially maintained that North

Pointe's contribution of $1 million to settle ICI's indemnification claim, which was

then passed on to Ferrin, satisfied the SIR obligation in the General Fidelity Policy,

and that General Fidelity was required to pay the remaining $600,000.  General

Fidelity argued that North Pointe's $1 million payment to settle the indemnity claim

did not reduce the SIR because that payment originated from Custom Cutting, not

---

[1]  See Exhibit A for the text of the SIR endorsement.

[2]   The text of the transfer of rights provision found in SECTION IV - COMMERCIAL
GENERAL LIABILITY LIMITS, 8. Transfer Of Rights Of Recovery Against Others To Us,
reads:

> If the insured has rights to recover all or part of any payment we have made under
> this Coverage Part, those rights are transferred to us.  The insured must do nothing
> after loss to impair them.  At our request, the insured will bring 'suit' or transfer
> those rights to us and help us enforce them.

ICI. As a result, General Fidelity maintained that the terms of the General Fidelity Policy required ICI to pay the additional $600,000 to settle Ferrin's claim.

To more narrowly frame this dispute, there can be no disagreement that had ICI borrowed the $1 million from a bank, deposited those funds, and then used those funds toward the settlement, that money would be credited toward the SIR. A more difficult question would be whether a separate insurance policy previously obtained by ICI to cover the retained amount could reduce the SIR. General Fidelity cites several cases to establish that money derived from additional insurance policies cannot be used to satisfy the SIR, and argues to this court that these decisions should be highly persuasive to this issue before us, just as they persuaded the district court. We are not completely convinced, however, that these cases are persuasive to the interpretation of the General Fidelity Policy before us today.

The particular language at issue in the General Fidelity Policy is different from the language in the policies at issue in the California cases cited by General Fidelity. These distinctions are potentially significant. Specifically, the policies in those cases are materially different for two reasons: (1) the General Fidelity Policy, unlike those policies examined by other courts, does not contain an explicit provision addressing

the precise issue in question,[3] and (2) the language of the General Fidelity Policy is arguably less restrictive than the language of the policies at issue in those cases.[4]

Requiring that a payment be made from one's "own account" is not necessarily the same as requiring that the retained limit be <u>paid</u> "by you." Indeed, a strong argument could be made that ICI exhausted its SIR because it <u>paid</u> for the protection afforded in the indemnification clause; to wit, ICI <u>paid</u> for that indemnity protection in the purchase price of the Custom Cutting subcontract and therefore hedged its retained risk, just as it could have <u>paid</u> for a loan or <u>paid</u> a premium on an insurance policy. Thus, we are not fully convinced of the district court's analysis as to this issue of Florida law.

---

[3] <u>See</u> <u>Ins. Co. of the State of Pa. v. Acceptance Ins. Co.</u>, 2002 WL 32515066, at *1 (C.D. Cal. Apr. 29, 2002) ("The Endorsement additionally contains a provision that addresses the possibility that [the insured] has other insurance covering the same claims. <u>This provision</u> is at the crux of the dispute between the parties to this action." (emphasis added)); <u>Forecast Homes, Inc. v. Steadfast Ins. Co.</u>, 105 Cal. Rptr. 3d 200, 205 (Cal. Ct. App. 2010) (including in the policy a provision stating, "[p]ayments by others, including but not limited to additional insureds or insurers, do not serve to satisfy the self-insured retention.").

[4] <u>Compare</u> <u>Travelers Indem. Co. v. Arena Grp. 2000, L.P.</u>, 2007 WL 935611, at *4 (S.D. Cal. Mar. 8, 2007) ("More importantly, a policy may prohibit the use of other insurance to satisfy a retention by including a policy provision requiring the insured to personally pay the retained amount. Here, subsection K.1, regarding 'Other Insurance,' provides that the 'Insured shall pay from its '<u>own account</u>' all amounts within the Retained Amount[.]'" (emphasis added) (internal citation omitted)) <u>with</u> <u>Vons Cos. v. U.S. Fire Ins. Co.</u>, 92 Cal. Rptr. 2d 597, 605 (Cal. Ct. App. 2010) ("Nowhere does the SIR expressly state that [the insured party] itself, not other insurers, must pay the SIR amount. Because the SIR was subject to the other insurance provisions, which also made the [insured party's] policy excess if there were another policy covering the accident, [insured party] could read the policy as permitting the use of other insurance proceeds to cover the SIR amount.").

7

In sum, without the language found in the cases cited supra, ICI's indemnification clause appears on its face to be more permissive. The dispute here is, in the absence of any other provision requiring payments directly from the insured's own account or expressly prohibiting the use of indemnification payments to satisfy the SIR, can a bargained- and paid-for right to indemnification serve to satisfy the SIR? Both parties agree that this is an unsettled issue.

## B.

Additionally, there is a related dispute between the parties as to whether the "made whole doctrine" applies or whether the parties contracted around that doctrine given the language of the transfer of rights provision.[5] Assuming that ICI could apply the funds it received to satisfy its SIR, the issue then becomes whether the transfer of rights provision in the General Fidelity Policy gave ICI or General Fidelity the priority to recover.[6]

---

[5] The "made whole doctrine" provides, absent a controlling contract provision that states otherwise, that the insured has priority over the insurer to recover its damages when there is a limited amount of indemnification available. See Schonau v. GEICO Gen. Ins. Co., 903 So. 2d 285, 287 (Fla. 4th Dist. Ct. App. 2005) ("Decisions applying the 'made whole' doctrine essentially hold that where both the insurer and the insured simultaneously attempt to recover all of their damages from a tortfeasor who cannot (because of insolvency, limited insurance coverage, or other reasons) pay the full value of damages, the insured has priority of recovery over the insurer." (citing Fla. Farm Bur. Ins. Co. v. Martin, 377 So. 2d 827, 828–30 (Fla. 1st Dist. Ct. App. 1979))).

[6] The implication of the answer to this question is that, even if ICI was able to count the amount it received in indemnification towards its SIR, that alone would be of little value if the

8

The transfer of rights provision found in the General Fidelity Policy reads as follows:

> If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring 'suit' or transfer those rights to us and help us enforce them.

The language of this provision on its face is clear—the insurer has subrogation rights. Given that both ICI and General Fidelity have some rights, the language is still completely silent as to who has <u>priority</u> to recover when the indemnity amount is insufficient to "make whole" both parties. ICI's argument is essentially two-fold: first, General Fidelity is not entitled to recover under the subrogation agreement because the plain language of the transfer of rights provision allows General Fidelity to recover only for payments "we <u>have</u> made," and, at the time it received the indemnification payment from Custom Cutting, General Fidelity had not yet made any payment; second, even if the court disregards the tense of the language, the General Fidelity Policy did not abrogate the "made whole doctrine" and thus ICI has priority to receive any indemnification before General Fidelity. ICI, therefore, provides two different avenues that the court could take to rule in its favor as to this

General Fidelity Policy gave General Fidelity the priority to be made whole before ICI could use any of the indemnity payment towards the SIR.

second issue. General Fidelity argues that the court cannot place excessive emphasis on the tense of the language, and further that the transfer of rights provision in the General Fidelity Policy abrogated the common law rule of the "made whole doctrine" by writing into the General Fidelity Policy priority rights for General Fidelity.

ICI cites a case from the State of Washington, Bordeaux, Inc. v. Am. Safety Ins. Co., 186 P.3d 1188 (Wash. Ct. App. 2008), for the proposition that the specific language of the transfer of rights provision found in the General Fidelity Policy does not write out the "made whole doctrine," thereby preserving ICI's right of priority. Id. at 1192–93 (holding that "[t]he trial court properly ruled that [the insureds] were entitled to be made whole before any third-party recovery funds are paid to the insurers." (citing Polygon Nw. Co. v. Am. Nat'l Fire Ins. Co., 189 P.3d 777 (Wash. Ct. App. 2008))). ICI further highlights that the Bordeaux court relied upon two Florida cases in crafting its analysis. Bordeaux first cited Zinke–Smith, Inc. v. Fla. Ins. Guar. Assn., 304 So. 2d 507, 509 (Fla. 4th Dist. Ct. App. 1974), cert. denied, 315 So. 2d 469 (1975)), to explain the distinction between self-insurance and primary insurance. See Bordeaux, 186 P.3d 1192 n.12 (citing Zinke–Smith, 304 So. 2d at 509). Bordeaux then cites Young v. Progressive Se. Ins. Co., 753 So. 2d 80, 85–86

(Fla. 2000), to reinforce its reasoning that self-insurance and primary insurance are distinct concepts.  See id. at 1192 n.17 (citing Young, 753 So. 2d at 85–86).

General Fidelity argues that Bordeaux is not on point, or, in any event, is not persuasive as to the ultimate issue.  Instead, General Fidelity argues that the language of the transfer of rights provision is sufficient to give General Fidelity priority to receive indemnity for the amounts it may have paid.  The parties do agree, however, that the Supreme Court of Florida has also not yet decided the precise issue as to whether the language found in the General Fidelity Policy displaces the background rule of the "made whole doctrine" under Florida law.

## C.

After hearing arguments, the district court found in favor of General Fidelity, and ICI appealed to this court.[7]  Relying on the express language of the General Fidelity Policy, the district court emphasized that the General Fidelity Policy required that the payments be made "by you [the insured]" and in other clauses required payments "by the insured."  See Order at 6, Intervest Constr. of Jax Inc., v. Gen. Fid. Ins. Co., No. 3:09-cv-00894-HES-JRK (M.D. Fla. Apr. 22, 2010) (citing several California cases as persuasive authority, despite acknowledging that none of the cases

---

[7] The District Court did not address the impact of the Bordeaux decision because ICI cited that decision for the first time in its reply brief to this court on appeal.

11

it relies upon have the same policy language). The district court then concluded that, because the payments did not originate from ICI, Custom Cutting's contribution to the settlement did not count against ICI's self-insured retention. Id. at 8.

III.

Resolution of the contrasting interpretations of the policy language raised by the parties is determinative of the cause in this case. In light of the absence of controlling precedent from the Supreme Court of Florida, we decline to predict how these policy provisions would be construed under Florida law. Instead, we respectfully certify the following questions for resolution:

> 1. DOES THE GENERAL FIDELITY POLICY ALLOW THE INSURED TO APPLY INDEMNIFICATION PAYMENTS RECEIVED FROM A THIRD-PARTY TOWARDS SATISFACTION OF ITS $1 MILLION SELF-INSURED RETENTION?

> 2. ASSUMING THAT FUNDS RECEIVED THROUGH AN INDEMNIFICATION CLAUSE CAN BE USED TO OFFSET THE SELF-INSURED RETENTION, DOES THE TRANSFER OF RIGHTS PROVISION FOUND IN THE GENERAL FIDELITY POLICY GRANT SUPERIOR RIGHTS TO BE MADE WHOLE TO THE INSURED OR TO THE INSURER?

We do not intend the phrasing of these questions to limit the court in its consideration of the problem posed by the case. As we have previously noted:

> [T]he particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the

12

issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are given, whether as a comprehensive whole or in subordinate or even contingent parts.

Swire Pac. Holdings v. Zurich Ins. Co., 284 F.3d 1228, 1234 (11th Cir. 2002) (alteration in original) (quoting Martinez v. Rodriquez, 394 F.2d 156, 159 n.6 (5th Cir. 1968)).

In order to assist the court's consideration of the case, the entire record, along with the briefs of the parties, shall be transmitted to the court.

QUESTION CERTIFIED.

EXHIBIT A

THIS ENDORSEMENT CHANGES THE POLICY.
PLEASE READ IT CAREFULLY

SELF-INSURED RETENTION
Per Occurrence

Self-Insured Retention: $1,000,000 Per Occurrence
Including Loss Adjustment Expense

In consideration of the premium charged, it is agreed the insurance afforded by the policy to which this endorsement is attached is subject to the following additional terms, conditions and provisions. In the event of a conflict between any of the terms, conditions or provisions of the policy and this endorsement, this endorsement will control the application of insurance to which the policy applies.

Unless otherwise specified, all terms used in this endorsement have the meaning set forth in the policy.

1. The Self-Insured Retention, shown above, applies to each and every "occurrence" or offense made against any insured, to which this insurance applies, irrespective of the number of claims which may be joined in to any one "suit" or claim.

2. Our total liability will not exceed the Limits of Insurance as specified in the policy Declarations, Coverage Parts or endorsements. The Limits of Insurance will apply only in excess of the Self-Insured Retention, hereinafter referred to as the "Retained Limit."

3. We have no duty to defend or indemnify unless and until the amount of the "Retained Limit" is exhausted by payment of settlements, judgments, or "Claims Expense" by you.

14

4. Should any claim under this policy result in a settlement or judgment not exceeding the "Retained Limit," including "Claims Expense," then no "Claims Expense," damages or indemnity will be payable by us.

5. Should any claim arising under this policy result in a settlement or judgment, including "Claims Expense" incurred by the insured or on the insured's behalf, in excess of the "Retained Limit," we will pay those amounts in excess of the "Retained Limit" to which this insurance applies subject to the Limits of Insurance as specified in the Declarations.

6. The "Retained Limit" will only be reduced by payments made by the insured.

7. No "Claims Expense" will be incurred on our behalf without our prior consent, nor will the insured voluntarily enter into a settlement which is in whole or in part in excess of the "Retained Limit," without our express written approval.

8. Should any claim within the terms of the coverage be subject to a demand for settlement whether below the amount of the "Retained Limit," or in excess of it, and should the insured decline to settle such a claim or demand, or to tender the remainder of the "Retained Limit" to us, our maximum liability will be limited to the amount for which the claim could have been settled, but only for that portion of the settlement or judgment in excess of the "Retained Limit."

9. Based upon the unique nature of this program and the need to coordinate the warranty program with the general liability insurance program, the insured agrees to retain Bridgeworks Commercial Management as its self-insurance service company for the purposes of providing claims service at its expense. Bridgeworks Commercial Management will provide service and

coordination for claims under the "Retained Limits" on behalf of the insured and under the control of the insured. However, this service will not be terminated or altered without our express written permission (or this policy will be declared null and void). The insured's agreement to enter into and abide by the terms and conditions of the contract with Bridgeworks Commercial Management, including payment and advance deposit of funds when a claim is reported, is a material representation under this policy.

10. Loss settlements made by the insured or its self-insurance company, in excess of the "Retained Limit," will not be binding against us.

11. With respect to any claim payable under this insurance and subject in whole or in part to the "Retained Limits" as provided in this endorsement, we will have the right, but not the obligation to assume the control of said claim and to pay any part of or all of the amount of any such loss including "Claims Expense" within the "Retained Limit" on behalf of and for the account of the insured to affect settlement of said claim. Amounts paid by us pursuant to this paragraph will be reimbursed to us by the insured within ten (10) days from the date of our written request to the insured. We will have the right to make partial recoveries from the insured when partial settlements or "Claims Expense" are incurred by us within the "Retained Limit" as provided by this endorsement.

12. We will have the right, but not the duty, to defend any "suit." The insured will have the obligation to defend any claim or "suit" which may involve this coverage without respect to the "Retained Limit," and to settle same within the "Retained Limit" where possible. Said obligation to defend continues until the "Retained Limit" has been exhausted by settlements or "Claims Expense," or until written permission to discontinue said defense is granted by us.

13. For purposes of this endorsement, the term "Claims Expense"will include all fees, costs, charges and expenses generated by attorneys designated to represent the insured, and all other costs, charges and expenses incurred in the investigation, adjustment, settlement, arbitration, defense or appeal of any claim to which this insurance otherwise applies. "Claims Expense" will not include the cost of investigating or adjusting a claim by salaried employees of the insured, the insured's self-insurance service company, wages or salaries of any employee of any insured and/or operating expense of any insured.

14. The insolvency, bankruptcy, receivership of the insured, or any refusal by or inability of the insured to satisfy its obligations pursuant to this endorsement will not reduce the "Retained Limit" as set forth in the endorsement, nor will it require us to pay any amounts within the "Retained Limit." The payment of the "Retained limits" by the insured is a condition precedent for our obligation to pay any sums either in defense or indemnity and we shall not pay any such sums until and unless the insured has satisfied its "Retained limits."

15. The "Retained limits" shall not be exhausted or satisfied by any payments or claims expenses for damages that would not have been covered by the terms of this policy. The "Retained limits" shall not be utilized in response to any "claims" that are not otherwise covered by the terms and conditions of this policy.

All other terms and conditions of the Policy remain unchanged.

(emphasis added by the parties).