(October 21, 1991)

■ EDITH BERNARD, Respondent, v JEROME M. BLOCK et al., Appellants, et al., Defendant.—In a medical malpractice action to recover damages for personal injuries, the defendants Jerome Block and Patrick O'Leary appeal, as limited by their brief, from so much of a judgment of the Supreme Court, Kings County (Levine, J.), entered January 6, 1989, as, upon a jury verdict, is against them and in favor of the plaintiff in the principal sum of $1,054,955.

Ordered that the judgment is reversed insofar as appealed from, on the facts, and the appellants are granted a new trial, with costs to abide the event.

The plaintiff Edith Bernard first consulted with the defendant Dr. Patrick O'Leary, a surgeon subspecializing in back surgery, on May 17, 1982, when referred to him by a doctor who employed her to clean his home and office. She was then 44 years old. At that time, she also worked as a kitchen assistant at a school. She had been suffering for the prior four years from problems with her legs, which were progressively growing weaker. From 1977 on, she had noted burning in her toes. Twice in January 1978 she had sustained injuries from falls, and suffered "heaviness" and burning sensations radiating to her feet. In November 1978 she was hospitalized in traction for weakness in the left lower extremity. Prior to consulting with Dr. O'Leary, she had seen many doctors, unsuccessfully seeking diagnosis and treatment. When she saw Dr. O'Leary, she was limping, dragging her right leg and complaining of recurring tiredness in the legs.

Although Dr. O'Leary recommended her immediate hospitalization for a thorough evaluation, including consultation with a neurologist and other specialists, the plaintiff delayed her admission to the hospital for six weeks to accommodate her work schedule. Upon admission to Lenox Hill Hospital on June 30, 1982, her condition appeared to Dr. O'Leary to have deteriorated. Concerned that a surgically operable spinal growth or other condition could be pressing on the spine, which could cause sudden and irreversible total paralysis, Dr. O'Leary found her situation urgent and ordered an immediate myelogram (X-ray of spinal cord after injection with contrast material) and neurological consultation with the defendant Dr. Jerome M. Block. He informed the plaintiff of the purpose of the myelogram, that it causes pain, discomfort and sometimes allergic reactions, but that it was essential for her diagnosis. She executed a consent form.

The first myelogram performed by the defendant Dr. Lewis

Rothman, a diagnostic neuroradiologist, on July 1, 1982, could not be completed because the needle struck a blood vessel. The next day, a neurosurgeon examined the plaintiff at Dr. O'Leary's direction, and agreed that there was "some urgency" in determining the nature of the plaintiff's problem. The following day the defendant Dr. Block performed a neurological examination of the plaintiff at Dr. O'Leary's request and agreed that a second complete myelogram was necessary in order to evaluate the plaintiff's symptoms. Dr. Block found evidence of "severe disease of the spinal cord", noting her spastic gait, weak legs, and complaints of numbness in her trunk and difficulty with bowels and bladder. In Dr. Block's opinion the plaintiff "was in trouble and headed downhill from there". He informed the plaintiff of the reasons for the myelogram. She indicated she understood and consented to the procedure.

On July 8, Dr. Rothman performed the second and complete myelogram, which revealed no tumor, disc or bone condition to account for the plaintiff's symptoms. In the course of the myelogram, spinal fluid extracted from the plaintiff's spine indicated she was suffering from a demylenating disease which could be multiple sclerosis.

The plaintiff testified that the myelograms caused her severe pain and discomfort. In particular, the second myelogram, which she claimed lasted two and one-half hours, was excruciatingly painful. Although the pain eventually dissipated, she testified that she was never, after the myelograms, able to walk unaided. She never returned to work. When she visited O'Leary's office on August 30, 1982, he informed her that her problems proved to be nonsurgical, but rather neurological, and advised her to continue seeing Dr. Block for follow-up care. On September 21, 1982, Dr. Block found increasing weakness in her legs and that she was unable to walk unaided.

In February 1986 when examined by Dr. Allan J. Sobin, a neurologist who testified as an expert witness on behalf of the appellants, the plaintiff walked with two canes, wrist supports, and braces on both legs. Thereafter, she suffered a stroke and also developed diabetes. One year later, in August 1988, she was examined by her expert witness, Dr. Sidney M. Cohen. At that time, she was confined to a wheelchair. Dr. Cohen's diagnosis of the plaintiff at that time was "demylenating disease * * * in this context * * * multiple sclerosis".

The plaintiff contends that the myelograms accelerated her

disease, causing her to become disabled. Moreover, she contends that she should have been informed in advance that the myelograms could worsen her condition. She supports these contentions with the fact of the deterioration of her condition immediately following the myelograms and with the opinion of her expert, Dr. Cohen.

Dr. Cohen, who is board certified in neurology and psychiatry, testified that the appellants deviated from accepted standards of medical practice in performing myelograms on the plaintiff, whose symptoms were consistent with demylenating disease, before first seeking to rule out the existence of the latter condition with less invasive tests such as "CAT" scan, spinal tap and evoked response techniques. Because the pantopaque dye injected into the spinal column during a myelogram can exacerbate the demylenating disease, it should, he claimed, be avoided wherever possible. He concluded further that but for the myelograms, the plaintiff could have continued walking and working for 20 years or more.

The appellants contend that far from deviating from accepted standards of medical practice, they acted reasonably, and in fact could have been found negligent had they failed to explore the likelihood that a condition pressing on the plaintiff's spine could cause sudden total paralysis. They allege their concern was reasonably predicated upon the plaintiff's past history of progressive loss of mobility of her legs and other symptoms, the apparent deterioration of her condition even during the six-week period intervening between her first visit to Dr. O'Leary's office and admission to Lenox Hill Hospital, and their extensive practical experience and specialized training. Based upon these factors, they concluded that the myelogram was the only way to rule out their most immediate concern. Moreover, the defense theory was supported by the testimony of Drs. Rothman and Sobin.

Upon our review of the foregoing evidence, we find merit in the appellants' contention that the jury's verdict was contrary to the weight of the evidence. It is well settled that an appellate court may only set aside a jury verdict as being contrary to the weight of the evidence when it finds that the jury could not have reached its verdict on any fair interpretation of the evidence (see, Cohen v Hallmark Cards, 45 NY2d 493; Jakalow v Consoli, 166 AD2d 414; Nicastro v Park, 113 AD2d 129). This determination involves a discretionary balancing of many factors which draw upon Judges' background and experience (see, Nicastro v Park, supra, at 135). As fairness is the central consideration, the court may set aside a

verdict as contrary to the weight of the evidence, where, as here, "it appears that the unsuccessful litigant's evidentiary position was particularly strong compared to that of the victor" *(Nicastro v Park, supra,* at 136).

The standard to which a physician is held in gauging the acceptability of his or her performance is whether he or she exercised his or her best judgment and reasonable care. A doctor is not a guarantor of correct diagnosis or successful treatment, nor is a doctor liable for a mere error in judgment if he or she has considered his patient's best interest after careful evaluation *(see, e.g., Oelsner v State of New York,* 66 NY2d 636; *Saliaris v D'Emilia,* 143 AD2d 996; *see generally,* 2B [1] Warren, NY Negligence, ch 52, § 5.06, at 501). The standard does not require the very highest degree of care, but that degree of care that a reasonably prudent doctor would exercise in the same circumstances in the community *(see, Pike v Honsinger,* 155 NY 201). However, even an error in judgment can be a basis for liability where the evidence establishes that the exercise of judgment was itself a deviation from accepted medical standards *(see,* 76 NY Jur 2d, Malpractice, § 105, at 114, citing *Schrempf v State of New York,* 66 NY2d 289) which thus denied the patient the level of care acceptable within the relevant professional community *(see, Toth v Community Hosp.,* 22 NY2d 255). The plaintiff offered evidence in this case to meet this burden, which persuaded the jury that such a deviation occurred.

However, although the testimony of the plaintiff's expert, Dr. Cohen, provided legally sufficient evidence of malpractice, and the appellants do not argue on appeal that the evidence adduced by the plaintiff was legally insufficient, the appellants' arguments that the jury's verdict was against the weight of the evidence are persuasive. To begin with, Dr. Cohen, who has admittedly testified in more than 100 cases, some involving alleged neurological malpractice and who might thus be considered by some to be something of a professional witness, was less than consistent in his testimony concerning the appropriateness of using myelograms as diagnostic tools where patients are potentially afflicted with multiple sclerosis.

During his direct examination, Dr. Cohen testified that the appellants departed from acceptable standards of practice in performing myelograms upon the plaintiff without first ruling out a diagnosis of multiple sclerosis. This was because, the doctor testified, the myelogram precipitates a breakdown of the myelin sheath surrounding the spinal cord through which

nerve impulses are transmitted. Indeed, Dr. Cohen opined that even a properly performed myelogram could exacerbate multiple sclerosis, "[a]nd that's why you avoid it unless you have to". Contending that various other less invasive tests, including CAT scans, spinal taps or evoked response techniques, should have been utilized first to rule out multiple sclerosis, Dr. Cohen testified that the plaintiff's multiple sclerosis was exacerbated by the myelograms performed by the appellants and but for these procedures the plaintiff's condition would not have deteriorated as rapidly.

Notably, Dr. Cohen offered no evidence other than his opinion, which was attributed to no specific medical data or case studies, that the plaintiff's multiple sclerosis was exacerbated by the two myelograms performed by the appellants. More significantly, Dr. Cohen himself acknowledged that the performance of a myelogram might be appropriate upon a patient with a differential diagnosis of possible multiple sclerosis when "you must do it for the survival or the welfare of the patient". Dr. Cohen did not explain what he meant by this nor did he offer an express opinion as to whether the instant myelograms were necessary for the survival or the *welfare* of the plaintiff. Moreover, he further acknowledged that myelograms were properly performed on multiple sclerosis patients in "rare situations" but, he insisted, "there are many other things one could do to delineate the problem without it". It is noteworthy that Dr. Cohen admitted that he had not performed a myelogram on a patient during the eight years prior to trial although, he stated, he was present while myelograms were performed on his patients by neuroradiologists.

The appellants' expert, Dr. Sobin, the Chief of Neurology at Woodhull Hospital and a more active practitioner, testified that neither myelogram performed upon the plaintiff contributed to her condition. Rather, he opined that she was suffering from a progressive neurological disease which was robbing her of the use of her legs. Dr. Sobin stated that a myelogram causes no negative effects upon a patient with multiple sclerosis or any other demylenating disease, and that he has performed such procedures on a number of patients exhibiting spinal cord symptoms. Dr. Sobin testified that the appellants had no way of knowing that the plaintiff did in fact have multiple sclerosis at the time the myelograms were performed. Indeed, in his opinion, the plaintiff's symptomology led to a "differential diagnosis"; any number of conditions could be responsible for her degenerative state. Dr. Sobin postulated that the plaintiff might have been suffering from a

central local spinal lesion such as a meningioma, a benign spinal tumor or even a herniated disc, any one of which could have been exerting pressure on the spinal cord. Since these conditions could be corrected by surgery, they were investigated first. Dr. Sobin opined that in 1982 a myelogram was the best means to conduct this investigation, and that the less invasive procedures suggested by Dr. Cohen would not have been nearly as effective. In short Dr. Sobin opined, "I would have done exactly the same thing".

Furthermore, in addition to the testimony of Dr. Sobin, the appellant physicians testified as to the measures they took to diagnose and treat the plaintiff's symptoms. The record reveals that the appellants appeared to conduct themselves in a careful and conscientious manner, consistent with the best interests of their patient.

Upon our review of the foregoing, we find that the weight of the credible evidence strongly preponderates in favor of a finding that the appellants did not depart from accepted medical standards in their treatment of the plaintiff. The jury's verdict to the contrary does not rest upon a fair interpretation of the evidence. In light of the urgency perceived by the appellants to rule out the existence of any operable condition which could lead to sudden paralysis, the evidence more strongly supports a finding that a myelogram, as the most effective diagnostic tool, was in fact not contra-indicated in the plaintiff's case.

In short, we hold that the evidence presented at trial failed to prove by a fair preponderance that the appellants, evaluating the information available to them, departed from accepted medical standards of care. Accordingly, the jury's verdict to the contrary must be set aside, and a new trial granted.

Furthermore, we find that the verdict that the appellants failed to fully apprise the plaintiff of the consequences of a myelogram is likewise against the weight of the evidence. Pursuant to Public Health Law § 2805-d (2), in order for a doctor to be found liable for failure to obtain a patient's informed consent to a procedure, the plaintiff must sustain the burden of proof on three issues. First, the doctor must have failed to apprise her of a reasonably foreseeable risk of the procedure. Secondly, having been informed of the risks and alternatives, the plaintiff must prove that a reasonable person in the plaintiff's condition would have opted against it, and thirdly, the plaintiff must prove that the procedure was the proximate cause of her injury.

Both Dr. O'Leary and Dr. Block explained that a myelogram could be painful and could result in an allergic reaction. They also advised that it was essential to the plaintiff's diagnosis. Although the plaintiff consented, she claims she should have been told it could make her worse.

The first issue for our determination is whether the evidence supports the jury's finding that the myelogram posed a reasonably foreseeable risk to the plaintiff. As indicated above, the evidence as to the negative effects of myelograms on multiple sclerosis patients is limited to Dr. Cohen's somewhat conclusory and contradictory statements, plus the uncontroverted fact that the plaintiff became substantially worse after their administration. The record is barren of any evidence as to how frequently multiple sclerosis patients were subjected to myelograms in 1982, how often they may have suffered injury, and how permanent the injury suffered may have been. We find that no fair interpretation of the evidence justifies the jury's verdict that the risk to her was foreseeable, or that a reasonable person would have opted against incurring that risk under her circumstances.

We note also that the sole evidence in support of the plaintiff's expert's claim that the myelograms were the proximate cause of the plaintiff's total permanent disability rests upon his further conclusory observation that "in general in the United States, patients [with multiple sclerosis] in the majority continue to work and function for twenty-five years and more with the disease", from which he concludes that but for these procedures the plaintiff could have continued working for 20 or more years. Since the plaintiff had suffered from a condition eventually diagnosed as multiple sclerosis for four years prior to the myelograms and suffered a stroke in 1987 prior to her examination by Dr. Cohen in 1988, the jury's finding of proximate cause inherent in their conclusion that the appellants failed to obtain the plaintiff's informed consent, rests upon fragile, albeit not necessarily insufficient evidence *(see, Monahan v Weichert,* 82 AD2d 102, 108; *Kallenberg v Beth Israel Hosp.,* 45 AD2d 177, *affd* 37 NY2d 719). Accordingly, this issue as well should be subject to a new trial.

In view of the foregoing, we need not reach the issue of the propriety of the damage award. However, we note that the jury should not have been instructed to consider and should not have awarded damages for loss of enjoyment of life separately from damages for pain and suffering *(see, McDougald v Garber,* 73 NY2d 246). "[L]oss of enjoyment of life is not a separate element of damages deserving a distinct award but

is, instead, only a factor to be considered by the jury in assessing damages for conscious pain and suffering" *(Nussbaum v Gibstein,* 73 NY2d 912, 914).

In light of our determination, we need not reach the appellants' remaining arguments. Thompson, J. P., Lawrence and Miller, JJ., concur.

Kunzeman, J., concurs in part and dissents in part and votes to modify the judgment appealed by deleting the provision thereof awarding the plaintiff nonpecuniary damages, and to remit the matter to the Supreme Court, Kings County, for a new trial on the issue of nonpecuniary damages only, with the following memorandum: I cannot agree with the majority's conclusion that the verdict was against the weight of the evidence. Although the majority has found that the unsuccessful litigant's evidentiary position was particularly strong, as opposed to that of the successful party *(see, Nicastro v Park,* 113 AD2d 129, 136), I am of the view that its fact-intensive analysis is an infringement upon the jurors' function *(see, Gonzalez v Moscarella,* 142 AD2d 550).

The jury returned a verdict absolving Dr. Rothman of liability and imposing liability against the appellants Drs. O'Leary and Block. The sums awarded the plaintiff were as follows: $250,000 for past pain and suffering and $250,000 for future pain and suffering; $200,000 for past loss of enjoyment of life and $200,000 for future loss of enjoyment of life; and $150,000 for loss of earnings to date and $150,000 for future loss of earnings. The trial court reduced the award for past loss of earnings to $53,805 and the award for future loss of earnings to $101,150, and left the remainder of the award intact.

In accordance with the oft-cited legal principle, a verdict should not be set aside as against the weight of the evidence unless the court finds that the jury could not have reached that verdict upon any fair interpretation of the evidence *(see, Cohen v Hallmark Cards,* 45 NY2d 493, 498; *Jakalow v Consoli,* 166 AD2d 414). While a verdict for the appellants might reasonably have been reached upon the evidence adduced, I do not believe that the determination of the jury, which had the opportunity to observe the witnesses' demeanors and to assess their credibility, was unreasonable.

Not only did the appellants fail to demonstrate that a myelogram was required in this case, but they also departed from accepted medical standards in failing to have addressed the possibility of multiple sclerosis, particularly after the

neurological consultation with Dr. Block, before introducing pantopaque dye into the plaintiff's spinal canal.

Moreover, the appellants' assertion of urgency is belied by Dr. O'Leary's own testimony. Although incomplete, the first myelogram indicated that no obstructions or lesions were visualized. Dr. O'Leary testified that, inasmuch as no blockage was detected, "emergency surgery went to the back burner" following that procedure. The conclusion seems inescapable that surgical intervention was no longer an urgent consideration and the welfare of the patient did not mandate the second myelogram. The appellants' argument that the urgency of the situation did not allow them the time to utilize less invasive tests, such as CAT scans, is also belied by the hospital charts. The progress notes for July 6, 1982, two days before the second myelogram, indicate that a CAT scan and bone scan were ordered. They were, however, apparently never completed. Accordingly, in light of the diminished urgency of the situation, there was, in fact, time for the appellants to utilize other diagnostic tests of a less invasive nature.

Although the verdict was not against the weight of the evidence, the jury should not have been instructed to consider and award damages for loss of enjoyment of life separately from damages for pain and suffering *(see, McDougald v Garber,* 73 NY2d 246; *Scariati v St. John's Queens Hosp.,* 172 AD2d 817). While the Court of Appeals acknowledged, in *McDougald,* that certain distinctions between the two types of awards could sometimes be articulated, it reasoned that permitting separate awards could amplify the "distortion" inherent in the assessment of damages for human suffering. Stated succinctly, "loss of enjoyment of life is not a separate element of damages deserving a distinct award but is, instead, only a factor to be considered by the jury in assessing damages for conscious pain and suffering" *(Nussbaum v Gibstein,* 73 NY2d 912, 914).

Accordingly, I would remit the matter to the Supreme Court, Kings County, for a new trial on the issue of nonpecuniary damages only. The appellants' remaining contentions are without merit.